[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16314

_____

D.C. Docket No. 8:14-cv-02528-JDW-AEP

CHRISTINA FELTS,

Plaintiff-Appellant,

versus

WELLS FARGO BANK, N.A.,
a national association,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 27, 2018)

Before TJOFLAT and WILSON, Circuit Judges, and ROBRENO,[*] District Judge.

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

ROBRENO, District Judge:

Christina Felts appeals from an order granting summary judgment in favor of her mortgage servicer, Wells Fargo Bank, N.A. ("Wells Fargo"), with respect to Felts' claim that Wells Fargo failed to conduct a reasonable investigation into the accuracy of its credit reporting of her mortgage loan, in violation of the Fair Credit Reporting Act ("the FCRA" or "the Act"), 15 U.S.C. § 1681 *et seq.* The district court found that Felts' FCRA claim against Wells Fargo failed as a matter of law because the undisputed material facts demonstrated that Wells Fargo's reporting of Felts' mortgage account as past due and delinquent during a forbearance plan was neither inaccurate nor materially misleading, and thus Felts failed to make the threshold showing that a reasonable investigation could have uncovered an inaccuracy. We affirm.

I.

In July 2009, Felts refinanced the mortgage on her Carmel, Indiana home through a new loan extended by the Federal National Mortgage Association, commonly known as Fannie Mae ("the Loan"). In connection with the Loan, Felts executed a Note and Mortgage that required her to make monthly mortgage payments of $2,197.38. Wells Fargo acted as the servicer for the Loan. As servicer, Wells Fargo was responsible for collecting Felts' mortgage payments, communicating with Felts regarding the payment of the Loan, and reporting certain

2

information to the consumer credit reporting agencies ("the CRAs") regarding Felts' compliance with her payment obligations under the Loan.

In January 2012, Felts lost her job. Several months later, she contacted Wells Fargo to discuss a revised payment plan for the Loan. Following Felts' telephone conversations with a Wells Fargo representative, Felts enrolled in an unemployment forbearance program offered by Fannie Mae and administered by Wells Fargo ("the Plan"). The terms of the Plan were set forth in an August 3, 2012, letter from Wells Fargo to Felts ("the Plan Letter"). The Plan Letter explained that Felts was required to make "monthly forbearance plan payments" of $25.00 per month beginning in September 2012 and ending in February 2013. Doc. 119-3 at 1. The Plan Letter stated that "[e]ven though your monthly statement will continue to show your regular mortgage payment amount, while you're under the Plan be sure you make the . . . forbearance plan payments by the due dates noted in place of your regular monthly mortgage payments." *Id.*

The Plan Letter further provided that, during the Plan's forbearance period, three conditions would apply: (1) if the loan was already in foreclosure, the foreclosure proceedings would be placed on hold; (2) Wells Fargo would "report to the credit bureaus that you are paying under a partial payment agreement for your Wells Fargo Home Mortgage"; and (3) the regular mortgage payments would

3

accrue during the course of the Plan. *Id.* at 2. With respect to the third condition, the Plan Letter stated:

> Even though your monthly forbearance plan payments are lower than your regular mortgage payments, the difference in the payment amounts accrues. We keep track of the total amount that accrues during the Plan period. The total accrued amount then becomes due and is your responsibility to pay after you complete the Plan, or when you become fully employed. When that happens, you can apply for payment assistance through a loan modification.

*Id.*

The Plan Letter further noted that "[e]ven though you are participating in this Plan, you remain responsible for all other terms and conditions of your existing mortgage." *Id.* at 3.

Prior to Felts' enrollment in the Plan, a Wells Fargo representative explained the terms of the Plan to Felts in a recorded telephone conversation. With respect to Felts' payment obligations, the representative explained that after the Plan ended, Wells Fargo would "take all that past due and they'll just tack it on to the end of the loan." Doc. 91-1 at 2-3. Felts asked whether her payments would still be considered late, clarifying "[b]ut you did say each month even though it's refigured as this it still shows up as a late payment?" *Id.* at 7. The Wells Fargo representative responded "[y]es. Because it's not the contractual payment." *Id.* Felts then confirmed that she understood.

4

After enrolling in the Plan, Felts made timely monthly payments of $25.00 per month through January 2013 in accordance with the terms of the Plan. She then secured new employment and applied for a loan modification with Wells Fargo. During a three-month trial period for the loan modification, Wells Fargo required Felts to make full payments on the Loan, which she did. Felts subsequently sold her home and paid off the entire remaining balance on the Loan by June 1, 2013.

In June 2013, Felts attempted to purchase a new home in Bradenton, Florida. Her loan officer obtained her credit report and informed Felts that Wells Fargo had reported the Loan to the CRAs as "past due" and "delinquent." Specifically, Wells Fargo reported the Loan as "30 Days Past Due" in August 2012, "60 Days Past Due" in September 2012, "90 days past due" in October 2012, "120 Days Past Due" in November 2012, "150 Days Past Due" in December 2012, and "180 or more Days Past Due" in January 2013. Doc. 105, Ex. 36. As of June 2013, Felts' credit report also listed a past due amount of $22,308 on the Loan. Doc. 114-3 at 6.

Over the next year and a half, Felts filed numerous disputes with all three major CRAs – Experian Information Solutions, Inc. ("Experian"), Equifax, Inc. ("Equifax"), and Trans Union LLC ("Trans Union") – regarding the Loan. The CRAs then reported the disputes to Wells Fargo. In response to the disputes, Wells

5

Fargo reported the account status of the Loan as "paid in full," and changed the "amount past due" to $0.00. Felts' updated credit report then reflected that there was no longer a past due amount on the Loan. However, Wells Fargo did not correct the delinquency information. Instead, on the dispute forms provided by the CRAs, Wells Fargo reported that Felts' account was past due from August 2012 through May 2013. A Wells Fargo loan specialist who processed one of the dispute forms testified that the account was considered past due for each of those months because Felts did not make her full contractual payment.

Felts was ultimately denied financing for the Bradenton home. In October 2014, Felts brought the underlying action against Wells Fargo, Experian, Equifax, and Trans Union, alleging that they violated various provisions of the FCRA in connection with their reporting of the credit status and history of the Loan.

With respect to Wells Fargo, Felts alleged that the company failed to conduct a reasonable investigation in response to Felts' credit reporting disputes regarding the Loan, as required under § 1681s-2(b) of the FCRA. Felts asserted that Wells Fargo's failure to conduct a reasonable investigation resulted in her denial of financing for the Bradenton home, which, in turn, required her to pay storage costs and rent for an additional six months. Felts further alleged that, because of her poor credit history, she was required to pay an initial deposit for an escrow account, a mortgage insurance premium, and appraisal and inspection costs

6

for her current home.  Felts claimed that she suffered stress, anxiety, depression, and related physical symptoms due to her overall experience with Wells Fargo. Following discovery, Felts and Wells Fargo filed cross-motions for summary judgment.[1]

On August 31, 2016, the district court granted Wells Fargo's motion for summary judgment and denied Felts' cross motion.  The court concluded that there was no genuine factual dispute as to the accuracy of the information Wells Fargo reported to the CRAs because there was no evidence of any factual inaccuracy or materially misleading impression.  The district court then entered judgment for Wells Fargo.  Felts appealed.

## II.

We review summary judgment rulings *de novo*, applying the same legal standards used by the district court.  *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1240 (11th Cir. 2013).  "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."

---

[1]     In the meantime, Felts settled with the CRAs.  As part of Felts' settlements with Experian and Trans Union, they both agreed to report the Loan with no history of past-due payments.

*Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004)

(citations omitted).  We "may affirm a decision of the district court on any ground

supported by the record."  *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714

F.3d 1234, 1236 n.1 (11th Cir. 2013) (quoting *Krutzig v. Pulte Home Corp.*, 602

F.3d 1231, 1234 (11th Cir. 2010)).

### III.

The FCRA is a consumer protection act that imposes certain duties on CRAs

and "furnishers of information" to CRAs.  Furnishers of information, including

mortgage lenders, are required to (1) report accurate information to CRAs

regarding consumers, *see* 15 U.S.C. § 1681s-2(a); and (2) conduct an investigation

after receiving notice from a CRA of a dispute lodged by a consumer regarding

information provided by the furnisher, *see id.* § 1681s-2(b).  Consumers have no

private right of action against furnishers for reporting inaccurate information to

CRAs regarding consumer accounts.  *See id.* § 1681s-2(c)(1).  Instead, the only

private right of action consumers have against furnishers is for a violation of

§ 1681s-2(b), which requires furnishers to conduct an investigation following

notice of a dispute.  *See id.*

Section 1681s-2(b) is the basis for Felts' claim here: she alleges that Wells

Fargo – a furnisher of information to the CRAs regarding Felts' compliance with

her payment obligations under the Loan – failed to conduct a reasonable

8

investigation in response to disputes she lodged with the three major CRAs regarding the information Wells Fargo reported.

Upon receipt of a notice from a CRA that a consumer disputes the completeness or accuracy of any information provided by a furnisher, the furnisher must (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided by the CRA; and (3) report the results of the investigation to the CRA. *See id.* § 1681s-2(b)(1). If the furnisher finds, following an investigation, that an item of information disputed by a consumer is incomplete, inaccurate, or cannot be verified, the furnisher must either modify, delete, or permanently block reporting of that information. *See id.* § 1681s-2(b)(1)(E). Further, with respect to information the furnisher finds to be inaccurate or incomplete, the furnisher also must report those results to all other CRAs. *See id.* § 1681s-2(b)(1)(D).

Section 1681s-2(b) thus "contemplates three potential ending points to reinvestigation: verification of accuracy, a determination of the inaccuracy or incompleteness, or a determination that the information 'cannot be verified.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1301-02 (11th Cir. 2016) (quoting 15 U.S.C. § 1681s-2(b)(1)(E)). A furnisher may verify that the information is accurate by "uncovering documentary evidence that is sufficient to

9

prove that the information is true," or by "relying on personal knowledge sufficient to establish the truth of the information." *Id.* at 1303.

The "appropriate touchstone" for evaluating a furnisher's investigation under § 1681s-2(b) is "reasonableness." *Id.* at 1301-02. "[W]hat constitutes a 'reasonable investigation' will vary depending on the circumstances of the case and whether the investigation is being conducted by a CRA under § 1681i(a), or a furnisher of information under § 1681s-2(b)." *Id.* at 1302. We have explained that "[w]hether a furnisher's investigation is reasonable will depend in part on the status of the furnisher – as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line-buyer – and on the quality of documentation available to the furnisher." *Id.* When a furnisher ends its investigation by reporting that the disputed information has been verified as accurate, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Id.*

Regardless of the nature of the investigation a furnisher conducted, a plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that *had* the furnisher conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it

10

reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information.  Absent that showing, a plaintiff's claim against a furnisher necessarily fails, as the plaintiff would be unable to demonstrate any injury from the allegedly deficient investigation.  And, in turn, a plaintiff cannot demonstrate that a reasonable investigation would have resulted in the furnisher concluding that the information was inaccurate or incomplete without identifying some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.

As a result, Felts cannot prevail on her claim against Wells Fargo pursuant to § 1681s-2(b) of the FCRA without identifying some fact in the record establishing that the information Wells Fargo reported regarding her account was inaccurate or incomplete.  If the undisputed facts indicate that Felts has not met this threshold requirement, Wells Fargo is entitled to judgment as a matter of law.

IV.

On appeal, Felts argues that the district court erred in finding that she failed to make the requisite threshold showing that Wells Fargo reported inaccurate information regarding the Loan.  She also contends, as she did below, that she could have met the threshold requirement by demonstrating that Wells Fargo's reporting was accurate but nonetheless materially misleading.  Felts argues that the district court erred in finding that she failed to make this alternative showing.

11

A.

The district court held that Felts failed to demonstrate that Wells Fargo's reporting was inaccurate because the undisputed material facts demonstrated that Felts' reduced payments, although timely under the Plan, were not the payments she was contractually bound to make under the Note.

As stated above, the Note for the Loan required Felts to make monthly mortgage payments of $2,197.38 per month. Felts concedes that she did not make payments of $2,197.38 per month beginning in July 2012. Indeed, it is undisputed that Felts did not make any payment in July 2012 and August 2012, and paid only $25.00 per month from September 2012 through January 2013. Felts nonetheless contends that the following facts Wells Fargo reported regarding the Loan were inaccurate: (1) that the "Scheduled Monthly Payment Amount" for the Loan was $2,197.38 per month every month, including during the Plan's effective period; and (2) that Felts' payments on the account for the Loan were "past due" and "delinquent" from July 2012 to January 2013.

Felts argues that this information was inaccurate because, based on the text of the Plan Letter and Wells Fargo's correspondence and representations regarding the Plan, "it is undisputed that during the Forbearance Plan period, Felts was not required to pay $2,197.38 beginning in July 2012." Appellant's Br. at 25. Felts also contends that the Consumer Data Industry Association's guidelines regarding

12

credit reporting ("the CDIA Guidelines") required Wells Fargo to report Felts'

account differently during the Plan period.  Finally, Felts relies on four district

court cases from outside this circuit permitting an FCRA claim against a furnisher

to move forward on the basis of allegedly inaccurate reporting in connection with a

loan modification agreement or forbearance plan, arguing that similar inaccuracies

existed here.

We find none of these arguments persuasive: neither the facts Felts identifies

in the record nor the CDIA Guidelines demonstrate that Wells Fargo reported

inaccurate information, and the cases Felts cites are inapposite.  We address Felts'

arguments seriatim.

i.

Felts argues that, under the explicit terms of the Plan, she was not required

to pay the full amount due on the Note during the Plan period.  Felts points to the

portion of the Plan Letter stating that "[t]he total accrued amount then *becomes due*

and is your responsibility to pay after you complete the Plan, or when you become

fully employed." *Id.* (quoting Doc. 119-3 at 2).  Felts argues that this language

means that the difference between the temporary, lower Plan payment and the full,

original loan payment was not due until after she completed the Plan, and therefore

that she was not required to make payments of $2,197.38 during the time period

the Plan was in effect.  Felts also notes that the definition of delinquency is "not

13

paying a debt as agreed," Appellant's Reply Br. at 5-6 (citing Black's Law Dictionary), and argues that because she paid the amounts Wells Fargo agreed she was required to pay in the Plan Letter, she was not delinquent on her debt. As a result, according to Felts, Wells Fargo should have reported the "Scheduled Monthly Payment Amount" as the lower amounts due under the Plan: zero dollars for July 2012 and August 2012, and $25.00 per month from September 2012 through January 2013. Felts also contends that Wells Fargo should not have reported Felts' payments as "past due" and "delinquent," because she was paying the amount Wells Fargo required her to pay under the Plan.

Felts' argument misconstrues Wells Fargo's reporting obligation. Wells Fargo was not required to furnish information to the CRAs regarding every agreement it formed with Felts. Instead, Wells Fargo was required to furnish information to the CRAs regarding Felts' payment status and history for one agreement in particular: the Note Felts signed for the Loan. The CRAs requested, and Wells Fargo submitted, information regarding Felts' compliance with her obligation to make installment payments in accordance with the Note she signed. Felts' apparent compliance with the terms of a second, separate agreement she entered into with Wells Fargo – the Plan – has no bearing on the accuracy of the information Wells Fargo reported to the CRAs regarding Felts' compliance with the terms of her first, original agreement – the Note – unless the Plan legally

14

modified the terms of the Note.  As Felts has not identified any fact in the record establishing that the Plan legally modified the Note, the information Wells Fargo reported regarding Felts' compliance with the terms of the Note was not inaccurate: Wells Fargo reported that (1) the Scheduled Monthly Payment Amount for the Note was $2,197.38, which Felts agrees that it was; and (2) Felts did not pay the amount the Note required her to pay beginning in July 2012, which Felts concedes she did not do.

ii.

Felts contends that, because the FCRA requires "maximum possible accuracy," Appellant's Br. at 26 (quoting 15 U.S.C. § 1681e(b)), "it is unreasonable from a factual standpoint for a furnisher to ignore its own correspondence and representations to a consumer in evaluating both what it reports and the contents of disputes as they relate to the accuracy of such reporting," *id.*

None of the "correspondence and representations" Felts identifies establishes that the Plan legally modified the Note.  As Felts concedes, the Plan Letter explicitly stated that Felts' payments under the Plan did not satisfy the amounts "owed" under the Note.  This language does not suggest that the Plan modified the Note, and instead confirms the opposite: that Felts' partial payments under the Plan did not satisfy the monthly payments the Note required her to make.

15

Felts' conversations with the Wells Fargo employee also indicate that the Plan did not modify the Note: the Wells Fargo employee confirmed to Felts that her payments would "still show[] up as a late payment" because "it's not the contractual payment."   Finally, the deposition testimony Felts cites merely describes how Wells Fargo decided what information to report and how the electronic systems Wells Fargo used for reporting functioned, and therefore has no bearing on the accuracy of the information Wells Fargo reported regarding Felts' account.

iii.

Felts argues that the CDIA Guidelines demonstrate that the information Wells Fargo reported regarding Felts' account was inaccurate.  Felts explains that the Fannie Mae Servicing Guide instructed servicers of Fannie Mae-originated loans, including Wells Fargo, to follow the CDIA Guidelines when reporting information regarding borrowers' accounts to CRAs.  Felts contends that, because the CDIA Guidelines required the "Scheduled Monthly Payment Amount" to be reported as the "new" payment amount for loans in forbearance, Wells Fargo should have reported that field as zero dollars for July 2012 and August 2012, and $25.00 for September 2012 through January 2013.  In addition, the CDIA Guidelines instructed Wells Fargo to include the "Special Comment Code" of "CP," to indicate that the Loan was in forbearance, which Wells Fargo did not do.

16

Felts contends that compliance with these guidelines "would undoubtedly have painted a vastly different picture of Felts' creditworthiness." Appellant's Br. at 33.

Felts acknowledges that the CDIA Guidelines did not instruct Wells Fargo to report her account as non-delinquent. However, Felts attempts to tie the Scheduled Monthly Payment Amount field to the reporting of her account as past due and delinquent by arguing that, had Wells Fargo reported the Scheduled Monthly Payment Amount as the lower amounts due under the Plan, Felts "never could have been reported" as late on her account for the Loan, and "never could have had any alleged past-due balance" for the Loan.

We find that the CDIA Guidelines do not establish that Wells Fargo reported inaccurate information. The CDIA Guidelines did not preclude Wells Fargo from reporting Felts' account as "past due" and "delinquent" for the months that Felts did not make full payments under the Note. Felts' argument that reporting the Scheduled Monthly Payment Amount field differently would have required Wells Fargo to report Felts' loan as current again misconstrues Wells Fargo's reporting obligation. During the Plan period, Felts was past due and delinquent on her payment obligations under the Note. Even if Wells Fargo had reported the specific amounts of Felts' scheduled partial payments, as opposed to alternatively reporting that Felts was "paying under a partial payment agreement," it would not have been inaccurate for Wells Fargo to report that Felts was not satisfying her payment

17

obligations under the Note.  With respect to the Scheduled Monthly Payment

Amount field itself, although Wells Fargo admits that it did not report that field as

indicated in the CDIA Guidelines, there are no facts in the record demonstrating

that reporting the amount as the lower amount due under the Plan would have

changed Felts' overall credit picture.  Indeed, had Wells Fargo reported the

Scheduled Monthly Payment Amount as $25.00 while simultaneously reporting

Felts' account as "past due" and "delinquent" – which was accurate – prospective

lenders may have interpreted the report to mean that Felts did not pay the lower,

$25.00 per month payment.

iv.

None of the cases Felts cites compels a different result.  Two of the cases

Felts cites, *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066 (D.

Or. 2011) and *Darrin v. Bank of America, N.A.*, No. 12-0228, 2013 WL 877087

(E.D. Cal. Mar. 7, 2013), involved loan modification agreements, not forbearance

plans.[2]  Under a forbearance plan, such as the one at issue here, a lender agrees to

---

[2]    In *Bradshaw*, the District of Oregon denied a furnisher's motion for summary judgment where the furnisher had reported the plaintiffs' account as delinquent after sending the plaintiffs a letter stating that their loan modification agreement had been approved and instructing them to pay the modified amounts rather than the original amounts. *See* 816 F. Supp. 2d at 1069-70, 1072.  The court determined that, viewing the facts in a light most favorable to the plaintiffs, they had entered into "a binding modification agreement" that lowered the payments due under their original mortgage. *Id.* at 1072.  Given those facts, the court found that a factual dispute existed regarding the accuracy of the defendants' reporting of the account as delinquent during the loan modification period. *See id.*  In *Darrin*, the Eastern District of California denied a motion to dismiss brought by the defendant furnisher where the furnisher reported the plaintiff's

18

temporarily refrain from exercising its rights under a loan agreement in exchange for payments from the borrower.[3]  In this case, Wells Fargo agreed to forbear from its right to foreclose on Felts' home in exchange for Felts' payment of $25.00 per month.  A loan modification agreement, by contrast, permanently legally alters a borrower's obligations under the original loan agreement.  Loan modification agreements reduce a borrower's monthly payments over the remainder of the loan term by, for example, reducing the interest rate or extending the length of the loan term.[4]

Felts asserts that *Bradshaw* and *Darrin* are both applicable because the Plan was a precursor to a potential later loan modification, and therefore, as in those two cases, it was inaccurate for Wells Fargo to report her payments as past due and delinquent when she was making the payments Wells Fargo instructed her to make.

---

mortgage account as delinquent while the plaintiff's loan modification application was pending, and the plaintiff alleged she made the payments the furnisher required her to make at that time. *See* 2013 WL 877087 at *4-5.

[3]    As the U.S. Department of Housing and Urban Development explains, a forbearance is one of several loan workout options available to borrowers who are unable to make their payments. *See* HUD: Explore Loan Workout Solutions to Avoid Foreclosure, https://www.hud.gov/program_offices/housing/sfh/econ/loanworkoutsolutions (last visited June 26, 2018) [hereafter HUD Workout Solutions].  Under a forbearance, a lender "may allow [a borrower] to reduce or suspend payments for a short period of time." *Id.*

[4]    Unlike a forbearance plan, a "mortgage modification" agreement allows the lender "to change one or more terms of [the] original loan to make the payments more affordable."  HUD Workout Solutions.  Under a modification, a borrower's loan is "permanently changed" by (1) adding the missed payments to the existing loan balance; (2) changing the interest rate, including making an adjustable rate into a fixed rate; or (3) extending the number of years the borrower has to repay. *Id.*

19

Felts is correct that the Plan Letter mentions that, at the close of the Plan period, Felts *could* apply for a loan modification. However, unlike in *Bradshaw*, in which the parties had already entered into a loan modification agreement, and *Darrin*, where the plaintiff's loan modification application was pending, Felts had not yet filed a loan modification application at the time that Wells Fargo reported her account as past due and delinquent. In addition, the payments Felts made were not the slightly reduced payments a borrower might have after legally modifying a loan agreement, but instead nominal payments that could not have resulted in the full payment of the Note within her lifetime.[5]

The sole case Felts cites in which a court considered a claim against a furnisher based upon information reported in connection with a forbearance plan as opposed to a loan modification agreement did not address whether or not the furnisher's reporting was accurate. In *Davenport v. Sallie Mae, Inc.*, 124 F. Supp. 3d 574 (D. Md. 2015), *aff'd*, 623 F. App'x 94 (4th Cir. 2015), the court determined that there were genuine issues of material fact with respect to whether or not the

---

[5]    Relying on *Bradshaw*, Felts also argues that it was "misleading at best" for Wells Fargo to report her payments on the Note as delinquent while simultaneously instructing her to make smaller payments. Appellant's Br. at 29. The *Bradshaw* court explained that it was misleading for the furnisher to report the plaintiffs' mortgage loan as delinquent because, construing the facts in the light most favorable to the plaintiffs, they had legally modified the terms of their loan agreement and paid the amounts due under the modified agreement. *See Bradshaw*, 816 F. Supp. 2d at 1072. That is not the case here, as the Plan did not modify the terms of the Note. To the extent that Felts argues that it was misleading *to her* for Wells Fargo to report her account as past due and delinquent while she was making the payments Wells Fargo asked her to make, that cannot form the basis for an action against a furnisher, as the FCRA only provides a private right of action against furnishers for the failure to conduct a reasonable investigation.

furnisher had conducted a reasonable investigation after reporting a loan as delinquent during a forbearance plan. *See id.* at 581. The court based its determination on correspondence between the furnisher and the plaintiff, which the court found created a factual dispute regarding the reasonableness of the investigation. *See id.* Felts contends that because inaccuracy is a threshold question, the court must have considered and rejected the furnisher's argument that the information it reported was accurate. However, nothing in the court's opinion suggests that the court evaluated the accuracy of the reported information as a threshold question; instead, the court mentioned the accuracy argument in passing when summarizing the arguments the furnisher made, and then proceeded to analyze the disputed facts regarding the reasonableness of the investigation. Further, even if the court had determined that, under the specific facts of that case, it was inaccurate for the furnisher to report the loan as delinquent during the forbearance plan, that has no bearing on whether the Plan at issue in *this* case legally modified Felts' Note.

The final case Felts cites, *Thorpe v. EduCap, Inc.*, No. 13-3830, 2013 WL 5956191 (N.D. Cal. Nov. 6, 2013), is even less applicable: the court did not address whether the furnisher's reporting was accurate in the context of the FCRA. Instead, the court dismissed the plaintiff's FCRA claim against the furnisher for failure to state a claim because the plaintiff had not adequately alleged that the

21

furnisher's investigation was not reasonable. *See id.* at \*6-7. The court separately evaluated whether the plaintiff had adequately pleaded that the furnisher's reporting of her student loan following a settlement agreement was misleading under California's Consumer Credit Reporting Act, not the FCRA. *See id.* at \*3-5.

\*    \*    \*

Under the circumstances of this case, regardless of whether Felts may have been confused about how her account would be reported to the CRAs, and whether the Wells Fargo could have better explained to Felts how the account would be reported, Felts did not meet her payment obligations under the Note. Therefore, the information Wells Fargo reported was not inaccurate as a matter of law.

B.

Felts argues in the alternative that, even if Wells Fargo's credit reporting regarding the Loan was technically accurate, it was nonetheless materially misleading. In support of this assertion, Felts cites cases from other circuits in which courts have allowed a consumer's claim to proceed against a furnisher on the basis of misleading statements or omissions, including three cases Felts claims are analogous to this action.

Felts cites *Freedom v. Citifinancial LLC*, in which the court denied a motion to dismiss an FCRA claim against the defendant furnisher, holding that the plaintiff had adequately alleged that the furnisher's reporting was inaccurate where it

22

reported the plaintiff's loan as discharged in bankruptcy, but then also reported a "scheduled payment" of $143.00 for the loan. *See* No. 15-10135, 2016 WL 4060510, at *6 (N.D. Ill. July 25, 2016). The court found that even though the report did indicate the debt was discharged, reporting a balance on the account "could create the mistaken impression that [the] [p]laintiff still owed on the account, which was not accurate." *Id.* Felts also cites *Twomey v. Ocwen Loan Servicing, LLC*, No. 16-0918, 2016 WL 4429895 (N.D. Ill. Aug. 22, 2016), in which the court similarly found that reporting a loan as having a balance and past due amount is misleading where the loan was discharged in bankruptcy, even if the report otherwise clearly indicates that the loan was discharged, because "a reader of the report could be misled into thinking that [the] [p]laintiff still personally owed this obligation (or, at a minimum, be confused as to this point)." *Id.* at 4.

Felts asserts that because she made every payment Wells Fargo required under the Plan, reporting her account as delinquent created a "wildly inaccurate" picture of her creditworthiness. Felts argues that she was conscientious, proactively contacting her loan servicer to discuss payment options following the termination of her employment, and that it was therefore misleading for her credit report to portray her as irresponsible by stating that her payments were "past due" and "delinquent," even if those statements were technically true. Felts claims that,

23

in terms of her credit report, she was hardly in a different position from someone who failed to make any loan payments whatsoever.

Felts' argument again ignores that her partial payments under the Plan simply were not the payments owed under the Note. Unlike in the cases Felts cites, where the borrowers no longer legally owed the amounts listed, Felts did owe payments under the Note, which she failed to make.[6] Therefore, it was not misleading for Wells Fargo to report that she was not making payments under the Note as agreed, particularly in light of Wells Fargo's additional statement that she was paying under a partial payment agreement.

Although Felts now likens her position to that of a person who made no payments at all, she ignores that the Plan provided her with a valuable benefit: she was permitted to stay in her home. Without the Plan, Wells Fargo could have foreclosed on Felts' mortgage following her inability to make full payments under the Note. Under the Plan, Wells Fargo gave up its foreclosure rights in exchange for token payments from Felts representing less than 2% of the amount owed each month. Indeed, if the Court adopted Felts' rule of law – that Wells Fargo was required to report Felts' payments as timely because it instructed her to make lower payments – Felts' credit report may have been misleading to prospective lenders,

---

[6]    Felts also cites *Dougherty v. Quicksius, LLC*, No. 15-6432, 2016 WL 3757056 (E.D. Pa. July 14, 2016), in which the court held that a criminal background report created a misleading impression where it duplicated entries regarding the plaintiff's prior criminal offenses. *Id.* at *2. As it involved a criminal background report, and not liability under the FCRA, *Dougherty* is not applicable here.

24

the report's intended recipients.  Felts' inability to meet her payment obligations under the Note is relevant information for a prospective lender:  upon viewing Felts' credit report, a lender could surmise that, during a period of unexpected financial difficulty, Felts either did not have or did not choose to use other funds to pay the full amount due under the Note.  Had Wells Fargo reported that Felts had made payments under the Note as agreed when she was in fact paying only $25.00 per month, the report would have conveyed that Felts fully met her payment obligations under the Note, which was not true.

Finally, Felts argues that Wells Fargo omitted information that created a materially misleading impression of Felts' compliance with the Note.  Specifically, Felts focuses on Wells Fargo's omission of the lower payment amounts she agreed to pay under the Plan in the Scheduled Monthly Payment Amount field.  As discussed above, those "omissions" did not render Felts' credit report misleading, particularly in light of Wells Fargo's additional affirmative statement that Felts was paying under a partial payment agreement.

V.

For the foregoing reasons, the judgment of the district court granting Wells Fargo's motion for summary judgment is

**AFFIRMED.**

25